DAVID M. GLOVER, Judge
Jessica Brown appeals the Saline County Circuit Court's decision to award permanent custody of her daughters, J.K.1 and J.K.2, to their father (Jessica's ex-husband), Claude Kirby, and to close the Arkansas Department of Human Services (DHS) case with respect to J.K.1 and J.K.2.[1] On appeal, Jessica argues (1) she did not fail to protect her daughters and in fact took appropriate measures to keep them from harm, and (2) DHS failed to prove Claude was a fit and appropriate parent for placement of their daughters. We affirm the circuit court's award of permanent custody to Claude.
Procedural Background
Jessica is currently married to Jacob Brown, and together they have a son, S.B.; Jacob also has a daughter, I.B., from a previous relationship. On January 23, 2017, DHS filed a petition for emergency custody of S.B., J.K.1, and J.K.2. The affidavit attached to the petition noted Jessica and Claude shared joint custody of J.K.1 and J.K.2 pursuant to their divorce decree, with Jessica as the primary custodian; it sought an emergency order removing the girls from Jessica's custody and leaving them in Claude's custody, as he was fit and appropriate; and it asserted continuing legal custody with Jessica presented an immediate danger to the health or physical well-being of the children.
On January 18, 2017, according to the affidavit, I.B. reported Jessica and Jacob had gotten into an altercation about selling Jacob's prescription medication; I.B. stated Jacob sold his prescription medicine and gave I.B. one of his prescription pills to "calm her down"; Jessica and Jacob both denied I.B.'s allegations; and J.K.1 and *459 J.K.2 confirmed Jessica had dropped Jacob off to "get money," and they had driven around the corner to wait for him.
On January 19, Jacob reported he had been arrested the night before for assault on a family member and was currently incarcerated at the Saline County Detention Center. In an interview with a family-service worker, Jacob explained he and Jessica had a verbal altercation, and he had "accidentally" slapped her as she was trying to call the police after he threatened suicide over concerns he might lose I.B. Jacob said I.B. and S.B. were present in the home during the altercation but were sleeping, and J.K.1 and J.K.2 were with Claude at the time of the altercation. Jessica reported Jacob had brandished a gun and threatened suicide, and while I.B. and S.B. did not witness Jacob hit her, they were awake and witnessed Jacob with the gun. When asked about her plan to protect the children from Jacob, Jessica stated Jacob would go to rehabilitation, although none was court ordered. At that time, Jessica refused to obtain an order of protection, stating Jacob did not mean to hurt her, he would not hurt the children, and she could not take time off work to obtain an order of protection. DHS concluded Jessica was unable to provide for the safety of the children, noting she had previously been ordered to limit J.K.1 and J.K.2's contact with Jacob due to his history of violence and drug use. The affidavit asserted J.K.1 and J.K.2's health and safety were in danger due to the allegations involving failure to protect, substance misuse, inadequate supervision, and parental unfitness.
Ex parte emergency orders of custody were entered on the same day, and J.K.1 and J.K.2 were ordered to remain in Claude's custody, with Jessica having only supervised visitation pending further hearings. A probable-cause order was filed on February 24, 2017, finding there was probable cause the emergency conditions that necessitated removal of all three children continued and continuing custody of S.B. with DHS and J.K.1 and J.K.2 in the custody of their father.
All three children were adjudicated dependent-neglected in an order filed on April 24, 2017; Jessica stipulated to the finding that the children were dependent-neglected. The circuit court found by a preponderance of the evidence the allegations were true. Specifically, it found Jacob had given I.B. two of his prescription Klonipin pills; he had brandished a handgun and threatened to kill himself in front of Jessica; he had forced I.B. and S.B. into a closet; he had then broken down a door to a room where Jessica, I.B., and S.B. had fled; and he then barricaded himself in a bathroom, still threatening to kill himself, until law enforcement arrived. The adjudication order stated the goal for J.K.1 and J.K.2 was to maintain them in Claude's home, with Jessica to have supervised visitation.
A review order, filed on July 26, 2017, found returning joint custody to Jessica was contrary to J.K.1 and J.K.2's welfare, and continuation of sole custody with Claude was in the girls' best interests. The review order noted that Claude had complied with the case plan in that he had maintained the girls in his home, seen to their needs, and was cooperating with DHS.
An agreed order for trial placement in Jessica's home for J.K.1 and J.K.2 was filed in August 2017, but the trial placement ended two days after it began because Jacob returned to the home under the influence of drugs and frightened the girls. At the time Jacob came home, Jessica had put S.B. to bed and had fallen asleep with him; the girls were alone in the living room. Claude filed a motion for permanent custody on September 6, 2017, alleging *460 there had been a material change in circumstances and it was in the best interest of the girls for permanent custody to be placed with him, with Jessica's visitation to be under the circuit court's strict guidelines.
After a review hearing on October 2, 2017, the circuit court entered an order awarding Claude permanent custody of J.K.1 and J.K.2 and closing the case as to them.[2] The circuit court found J.K.1 and J.K.2 could not return to Jessica's custody because she could not protect their health and safety, and it was in the girls' best interest for Claude to have custody. The circuit court noted its concerns about Jessica's ability or willingness to provide necessary supervision to protect the girls from harm and expressed its concerns about Jacob's drug use; Jacob being under the influence of drugs in the girls' presence with Jessica's knowledge; and Jessica's judgment, or lack thereof, and how it would affect her future relationships with Jacob and the girls. The circuit court squarely rejected Jessica's argument that if S.B. was safe with her, J.K.1 and J.K.2 would also be safe, pointing to the August incident in which Jessica was with S.B. and he was safe, but J.K.1 and J.K.2 were exposed to unsupervised contact with Jacob while he was using drugs and were not safe. Jessica was awarded reasonable visitation, but Jacob was ordered not to have any contact with the girls. The circuit court specifically found Claude had complied with the case plan and court orders, as he had been a stable and appropriate placement for the girls during the case. Jessica filed a timely notice of appeal from this order.
October 2, 2017 Review-Hearing Testimony
DHS caseworker Rose Farquhar testified it was DHS's position S.B. could be safely returned to Jessica's custody because Jessica had stated she planned to file for divorce from Jacob, who was now in long-term rehabilitation. She also noted Jessica removed herself from the home she shared with Jacob after the January 2017 incident. Farquhar explained a trial home placement was attempted for J.K.1 and J.K.2 with Jessica on a Friday in August; on Saturday, the girls witnessed Jacob under the influence of some substance, slurring his words, and falling over the furniture; J.K.1 was especially fearful of this behavior from Jacob; and while DHS had assured her everything was okay, the girls were exposed to this behavior after only one day of being with Jessica. Jessica explained to Farquhar that she had gone to lay S.B. down and had fallen asleep with him, and the girls had witnessed Jacob's behavior in the living room at that time. Farquhar admitted on cross-examination the girls did not tell Jessica about the incident until Sunday, and Jessica contacted Farquhar at that time.
Farquhar was unaware Jessica did not have the money to file for divorce from Jacob; she said Jessica told her she was not going to be around Jacob because she did not want to jeopardize her chances to be with her children. Farquhar admitted Jessica had moved out of the house when Jacob relapsed, but Farquhar still recommended that permanent custody of the girls be placed with Claude because with Jessica's not knowing when Jacob would come home the weekend of the trial placement, she should have been with the girls, especially due to J.K.1's anxiety about returning *461 home and being around Jacob. Farquhar was concerned that if Jacob returned from rehabilitation and Jessica had not divorced him by that time, he would be allowed to return to the home; she believed the family ultimately had always wanted to remain together. Farquhar defended the decision to attempt a trial placement, stating Jessica and Jacob had done everything asked of them, and there was no indication Jacob had begun using drugs again until the trial placement. Farquhar stated it should have been a red flag for Jessica that Jacob did not come home on the Friday night of the trial home placement, and she believed Jessica should have been "a little bit more aware" of the girls because they had suffered the most trauma over Jacob's drug use and were scared when they saw him under the influence. Farquhar testified the girls were stable with Claude and were doing well in school.
Jessica testified she had done everything DHS had asked her to do. She explained that on the Friday night of the trial placement, Jacob got mad at her because she went into Claude's home to look at J.K.2's room; Jacob did not come home that night; but he came home the next morning. According to Jessica, Jacob went out Saturday night and came back home around 10 p.m. and was fine; she went to put S.B. down and fell asleep; when she awoke, she checked on the girls; J.K.1's stomach was hurting, and I.B. said she could not sleep. Jessica testified the girls did not tell her about Jacob until Sunday night, but they could not tell her why they waited so long to tell her. Jessica said Farquhar had told her Jacob could move back into the house, but when he did, she moved in with her mother so she would not jeopardize her children. Jessica testified she wanted the custody arrangement to go back to joint custody with her being the primary custodian. She explained she wanted a divorce but could not afford to pay for it. She testified that she did not intend to get back together with Jacob when he got out of rehabilitation, and it depended on whether he maintained sobriety and established a home as to whether she had contact with him. She knew her girls did not want to be around Jacob, and she was willing to do whatever it took to keep them away from him. However, Jessica admitted she owned a home with Jacob, both were on the mortgage, and he had the right to enter the home any time he wanted to do so. Jessica reiterated she did not believe she would stay with Jacob at this point, but she had hopes Jacob would have months of stability and sobriety so he could be the father he needed to be.
Boyce Barger, the girls' counselor, testified J.K.1 is a highly anxious child who had several anxiety-related episodes over the last few months, and he believed if she were put in a situation where she felt caught between her mother and father, it would be devastating to her. Barger said the girls had not voiced an opinion about wanting to go back to the prior custody arrangement, but the girls love both parents and want to see both of them. However, it was Barger's opinion that custody should be placed with Claude Kirby. He based this opinion on the fact Jacob and Jessica did not have a good understanding about the egregious nature of what had brought the children into DHS custody, and they tried to minimize their conduct and attempted to create a moral equivalency between what Jacob had done and what they alleged Claude had done, such as "flipping them off" at a ballgame. Barger also was concerned about the January 2017 incident where Jacob had a gun, but Jessica did not remove herself from the situation and continued to live with Jacob. Barger was of the opinion the girls were safe and secure with Claude, and there was a reduction in J.K.1's stress when she was at Claude's home. Barger's greatest concern *462 was that the girls be in a safe and nurturing environment, and he stated that change at this point could create more anxiety for J.K.1.
Claude Kirby testified the girls were doing well in school. He admitted he had trust issues with Jessica, as she had previously assured him she was "done with" Jacob and they were getting divorced, only for them to be attempting to work things out the following week. Claude stated he and his wife had provided the girls with a stable home, and they had invited Jessica over to "hang out" with the girls, which she had done on a few occasions. He testified that if he received sole custody, he would like for Jessica to be able to see the girls, but he had concerns about Jacob.
Janna Kirby, Claude's new wife, testified they had been married about six months. She said her relationship with the girls is very positive.
The circuit court stated its primary concern was Jacob's repeated substance abuse and his behavior when he was impaired and, to a lesser but significant extent, about Jessica's judgment regarding her future relationship with Jacob and the potential impact it has on the children. The circuit court made it clear it was not ruling on Claude's motion for permanent custody but was ruling instead on DHS's petition. The circuit court then placed permanent custody with Claude subject to reasonable visitation by Jessica and no contact with Jacob during those periods of visitation. The circuit court then closed the case with respect to J.K.1 and J.K.2.
Standard of Review
In juvenile proceedings, our standard of review on appeal is de novo, and we do not reverse unless the circuit court's findings are clearly erroneous. Wheatley v. Arkansas Dep't of Human Servs. , 2016 Ark. App. 438, 503 S.W.3d 86. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. Due deference is given to the superior position of the circuit court to view and judge the credibility of the witnesses. Metcalf v. Arkansas Dep't of Human Servs. , 2015 Ark. App. 402, 466 S.W.3d 426. This deference is even greater in cases involving child custody, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. Thomas v. Arkansas Dep't of Human Servs. , 2012 Ark. App. 309, 419 S.W.3d 734.
Discussion
Jessica first argues she did not fail to protect her daughters and, in fact, took appropriate action to keep them safe from harm. She points to her testimony she was not in a relationship with Jacob, she simply did not have the funds to divorce him. She argues that although J.K.1 and J.K.2 saw Jacob intoxicated, they were not harmed or threatened by Jacob, and they did not seek her out to tell her what had happened. After the girls told her about the incident, Jessica reported the situation and removed the children from the home. She contends putting S.B. to bed and falling asleep with him is not a lack of judgment worthy of removal of custody.
Jessica places much weight on the fact that the girls were not harmed or threatened with harm. However, she ignores the history of the case, where Jacob had brandished a gun and threatened to kill himself, and the fact that the girls, J.K.1 more than J.K.2, had suffered great anxiety while in her custody due to Jacob's actions. While Jessica stated she was not in a relationship with Jacob and did not intend to have a relationship after he completed *463 rehabilitation, the circuit court was not required to believe this testimony, and it could certainly take note of the fact that Jessica could not even bother to take time off from work to obtain an order of protection after the January 2017 incident.
Arkansas Code Annotated section 9-27-334(a)(2)(A) (Repl. 2015) provides that if a juvenile is found to be dependent-neglected, the circuit court may enter an order transferring custody of the juvenile to a relative or other individual if it is in the best interest of the juvenile. Here, Boyce Barger, the girls' counselor, testified it was in their best interest for custody to remain with Claude because it was more stable for them. Jessica is asking our court to reweigh the evidence more heavily in her favor, which we will not do. The circuit trial court's decision to place permanent custody with Claude was not clearly erroneous.
Jessica next argues DHS did not prove Claude was a fit and appropriate parent for the girls. DHS only had to prove it was in the children's best interest to transfer custody to Claude. Ark. Code Ann. § 9-27-334(a)(2)(A). Claude and Jessica had joint custody prior to DHS becoming involved. There was no evidence presented to counter the evidence that the girls had been with their father for an extended period of time and were stable and doing well in school while in his custody. Furthermore, it was the opinion of the girls' counselor that Claude should have permanent custody because it was in the girls' best interest. The circuit court's decision was not clearly erroneous.
Affirmed.
Gladwin and Whiteaker, JJ., agree.

Although other children were involved in this case, the present appeal only concerns J.K.1 and J.K.2, Jessica's children with Claude Kirby.

This order also placed S.B. in Jessica's custody, finding that to be in S.B.'s best interest. S.B.'s custody is not an issue in this appeal.